## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MONTGOMERY CARL AKERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0140 (EGS) |
| | ) | |
| HARRELL WATTS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, a federal prisoner, brings this civil rights action against various officials, employees and agents of the Federal Bureau of Prisons ("BOP"), the Federal Bureau of Investigation ("FBI"), the United States Attorney's Office for the District of Kansas, and the United States Marshals Service ("USMS") in their individual capacities under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and under 42 U.S.C. §§ 1983 and 1985(3).[1] This matter is before the Court on the federal defendants' motion to dismiss, and for the reasons discussed below, the motion will be granted.

### I. BACKGROUND

#### A. *Plaintiff's Criminal History*

Plaintiff has a history of committing crimes while incarcerated. Notwithstanding his conviction on fourteen counts of bank fraud, one count of making, uttering and possession a

---

[1] A separate motion to dismiss has been filed on behalf of the defendants employed by the Corrections Corporation of America [Dkt. #99].

counterfeit security, and one count of failure to appear, he continued his criminal activities

"[w]hile serving a 105-month sentence at the federal penitentiary in Leavenworth, Kansas."

*United States v. Akers*, 261 Fed. Appx. 110, 111 (10th Cir. 2008). The Tenth Circuit summarizes

his activities as follows:

> [Plaintiff] placed an advertisement for a pen pal in a magazine. Anita Jenkins answered the ad and began corresponding with [plaintiff] in writing and on the telephone. [Plaintiff] convinced Jenkins he had been falsely accused, told her he had a trust fund account and asked her to help him re-start a business he had prior to his incarceration. Jenkins agreed to help him. [Plaintiff] sent her a power of attorney and had her purchase computer software which would allow her to create checks. He also had her open accounts at Fidelity Brokerage Services (Fidelity) and First Union Bank.
>
> After these accounts were opened, [plaintiff] directed Jenkins to create two checks in the amounts of $35,000 and $25,000 and deposit them into the Fidelity account. He provided her the routing and account numbers. She believed the money was coming from his trust fund account. [Plaintiff] then directed Jenkins to wire $58,000 from the Fidelity account to the First Union Bank account. Jenkins later created a third check for $35,000 and deposited it into the Fidelity account. Jenkins also created checks or initiated wire transfers totaling $57,000 from the First Union Bank account to various individuals. Jenkins did not learn she was creating worthless checks and engaging in fraudulent activity until she was contacted by law enforcement officers. As a result of the above scheme, Fidelity and Bank of America (which negotiates Fidelity's financial transactions) suffered actual losses of $22,236.77 and $20,000, respectively. [Plaintiff] was subsequently indicted with five counts of wire fraud.

*Id.* The indictment did not deter plaintiff's criminal activities:

> While the indictment was pending, [plaintiff] was housed at the Corrections Corporation of America (CCA) in Leavenworth, Kansas, where he met fellow inmate Donald Mixan. [Plaintiff] told Mixan he was wealthy and showed him paperwork indicating he had an account containing over $7 million. Although he initially believed [plaintiff], Mixan soon realized it was a scam. Nevertheless, Mixan agreed to help [plaintiff] because it was "[e]asy money." Once Mixan was released, [plaintiff] had him purchase check-writing software and apply for credit cards. [Plaintiff] directed Mixan to use the credit cards for his living expenses; the cards' balances were paid from accounts which had no money in them.
>
> [Plaintiff] instructed Mixan to send two checks totaling $150,000 to an attorney

[plaintiff] wanted to retain. These checks were intercepted by law enforcement officers. Because the attorney never received the checks, Mixan personally delivered a third check for $100,000 to him. Two more checks, in the amounts of $25,000 and $2,700, were sent to [plaintiff]'s alleged wife and Mixan's landlord, respectively. All five checks were drawn on a U.S. Bank account that Mixan opened for [plaintiff] over the Internet with a $400 counterfeit check. Mixan also created a check for $2,500 using an account number he found in a dumpster. This check was deposited, at [plaintiff's] direction, into one of [plaintiff's] bank accounts. [Plaintiff] further directed Mixan to create a $117,000 check and deposit it into another one of [plaintiff's] bank accounts. Fortunately, the banks involved in this scheme were able to avoid incurring financial loss by freezing the accounts or intercepting, dishonoring or returning the checks to the payee. However, the scheme did result in an actual loss of $2,037.21 to various businesses.

*Id.* at 112 (internal citation omitted). "The government filed a superseding indictment against Akers which, in addition to the five counts of wire fraud alleged in the original indictment, included a conspiracy to commit bank fraud count related to [plaintiff's] activities with Mixan, who was named as a co-defendant." *Id.* Plaintiff pled guilty to one count of wire fraud, *id.*, and while awaiting sentencing, his criminal activities continued:

This time plaintiff preyed on Tony Casanova, who suffers from multiple sclerosis. [Plaintiff] and Casanova became pen pals through Casanova's church. Casanova opened a bank account for [plaintiff] and applied for a credit card for him. [Plaintiff] also sent Casanova his telephone bills, promising to reimburse him. At [plaintiff's] direction, Casanova responded to a newspaper advertisement seeking investors for a casino boat. The person who placed the advertisement referred [plaintiff] to Nick Voulgaris. [Plaintiff] convinced Voulgaris he was wrongly convicted and was wealthy. Although the casino deal fell through, [plaintiff] succeeded in recruiting Voulgaris to help him start a business. At [plaintiff's] direction, Voulgaris created various checks totaling over $1 million and expended numerous hours on starting the business. Voulgaris also spent over $8,000 of his own money. In the end, Casanova's son contacted law enforcement personnel, who pulled the plug on [plaintiff's] scam.

This did not stop [plaintiff], however. He proceeded to dupe Cheryl Navarrette, a former cellmate's daughter. Based on [plaintiff's] promise of employment and financial security, Navarrette purchased check-writing software and her husband quit his job. Fortunately, Navarrette could not get the software to work and no fraudulent checks were produced. However, Navarrette and her family suffered financially.

*Id.* at 112-13.

Plaintiff is serving a sentence of 327 months' imprisonment, Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem."), Ex. A (Public Information Inmate Data) at 4, and currently is incarcerated at the BOP's Administrative Maximum facility in Florence, Colorado ("ADX").

### B. Mail Restrictions

The sentencing court was "appalled[,] disappointed and outraged" with the Department of Justice's failure to prevent [plaintiff] from continuing his criminal conduct while incarcerated," *United States v. Akers*, 261 Fed. Appx. at 114 n.2, and made the following recommendations to the BOP:

> (1) That [plaintiff] be placed in segregated confinement; (2) that [plaintiff] have no incoming or outgoing mail correspondence with anyone except his attorney of record (meaning: an attorney who has actually entered an appearance in the case), and that any legal mail be scrutinized in his presence; (3) that [plaintiff] have no telephone privileges whatsoever; (4) that the [BOP] take whatever steps are necessary to prevent [plaintiff] from engaging in any further fraudulent schemes while in custody.

Defs.' Mem., Ex. B (excerpt of criminal judgment).

In February 2007, the Warden of the ADX "placed [plaintiff] on restricted general correspondence [status] pursuant to 28 C.F.R. § 540.15" because plaintiff's "use of the mail to conduct fraudulent business activity pose[d] a threat to security and good order of the institution and protection of the public." Defs.' Mem., Ex. C (Memorandum to plaintiff from R. Wiley dated February 26, 2007). Plaintiff's "general correspondence (incoming/outgoing) [was] limited to/from verifiable family members only (spouse, mother, father, children, and siblings)," *id.* (Notice of Inmate Restrictions effective February 21, 2007). His restricted general correspondence status ended on March 23, 2009. *See* Pl.'s Resp. to Fed. Defs.' Combined Mot.

to Dismiss ("Pl.'s Opp'n"), Ex. 33 (Memorandum from R. Wiley dated March 23, 2009).

*C. Allegations of Plaintiff's Amended Complaint*

According to plaintiff, defendants "willfully entered into a . . . conspiracy to violate [his] constitutional rights . . . by frustrating and restricting his communication with the outside world, without notice or due process, in order to destroy his family, social, business, . . . professional and religious ties to the community." Am. Compl. at 2.

Plaintiff had been incarcerated at a correctional facility operated by Corrections Corporation of America ("CCA") in Leavenworth, Kansas, from July 2004 through December 5, 2005. Am. Compl. at 3. During that time, CCA staff "began confiscating [plaintiff's] social and legal mail . . . and eavesdropping on [his] legal phone calls to his attorneys" without justification, *id.* at 3-4, under orders from FBI Special Agent James Keszei, *id.* at 5. In addition, confiscated mail and personal property were forwarded to Deputy United States Marshals Michael Shute and Christopher Johnson, *id.* at 6, and transferred to FBI Headquarters in Washington, D.C., *id.* at 7. Special Agent Keszei's actions, taken with the assistance of Kim I. Martin, Assistant United States Attorney for the District of Kansas, "worked to insure that the plaintiff's financial, marital, family, social communications would be destroyed based upon false accusations of criminal misconduct." *Id.* at 7-8. Subsequently, while detained at the Federal Transfer Center in Oklahoma City, Oklahoma ("FTC Oklahoma City") from December 5, 2006 to February 8, 2007, unidentified mailroom officers confiscated his mail. *Id.* at 3.

Leslie Smith, of the BOP's Counter-Terrorism Division, with the approval of BOP Central Office staff, allegedly was responsible for plaintiff's classification as a "terrorist," *id.* at

5, assignment of a "maximum management variable," and his designation to ADX, *id.* at 4-5.[2]
Upon his arrival at ADX, on February 8, 2007, he was "unofficially restricted from
communicating with the outside world," *id.* at 2, through mail restrictions, *see id.* at 14-15.
Specifically, plaintiff alleged that Ron Wiley, Christopher Synsvoll, Dianna T. Crist, Michelle
Bond, Wendy Heim and Rick Martinez, all BOP staff members at ADX, confiscated and opened
both incoming and outgoing social and legal mail, *see id.* at 10-12, and conferred with "their
unknown handlers of the F.B.I. Counter-Terrorism D.C. office by phone, mail, e-mail
communication," *id.* at 12. Further, Michael Nalley, the BOP's North Central Regional Director,
denied plaintiff's inmate grievance arising from these actions, thereby acknowledging and
approving of this unlawful conduct. *Id.* at 12-13. At the final stage of the inmate grievance
process, Harrell Watts, National Appeals Coordinator for the BOP, too, acknowledged and
approved the ADX staff members' actions with respect to his mail, thus violating plaintiff's
rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States
Constitution. *Id.* at 13-15.

As a result of the federal defendants' actions, plaintiff allegedly is unable to "access his
financial accounts located and held by E-Trade Financial," *id.* at 8, and to maintain contact with

_____

[2]     The BOP assigns a  management variable when an inmate's "placement has been
made and/or maintained at an institution level inconsistent with the inmate's security score — a
score which may not completely/accurately reflect his or her security needs." BOP Program
Statement 5100.08, <u>Inmate Security Designation and Custody Classification</u> (9/12/2006), ch. 2 p.
3. An inmate's security level "identifies the institution type required to house [him] based
on [his] histor[y], institutional adjustment, and Public Safety Factor[] as well as the physical
security of the institution to include mobile patrols, gun towers, perimeter barriers, housing,
detection devices, inmate-to-staff ratio, and internal security." *Id.*, ch. 2 p. 5. Plaintiff considers
himself a "low security" inmate, Am. Compl. at 5, and objects to his designation to ADX, a
maximum security facility.

his family, *id.* at 9. He demands an award of monetary damages, *id.* at 17-20, and injunctive

relief, *id.* at 20-22, among other relief.

## II. DISCUSSION

### A. *Personal Jurisdiction*[3]

"A District of Columbia court may exercise personal jurisdiction over a person domiciled

in, organized under the laws of, or maintaining [a] principal place of business in, the District of

Columbia as to any claim for relief." D.C. Code § 13-422. It is the plaintiff's burden to make a

*prima facie* showing that the Court has personal jurisdiction over the defendants. *See First*

*Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir. 1988); *Walton v. Bureau*

*of Prisons*, 533 F. Supp. 2d 107, 112 (D.D.C. 2008). Moreover, the "[p]laintiff must allege

specific facts on which personal jurisdiction can be based; [he] cannot rely on conclusory

allegations." *Moore v. Motz*, 437 F. Supp. 2d 88, 91 (D.D.C. 2006) (citations omitted). Absent

allegations that the defendants either reside or maintain a principal place of business in the

District of Columbia, the Court engages in a two-part inquiry to determine whether it may

exercise personal jurisdiction over non-resident defendants.

The Court first must determine whether personal jurisdiction may be exercised under the

District of Columbia's long-arm statute. *See GTE New Media Servs., Inc. v. Bell South Corp.*,

199 F.3d 1343, 1347 (D.C. Cir. 2000); *see also Ibrahim v. District of Columbia*, 357 F. Supp. 2d

187, 192-93 (D.D.C. 2004) (determining in a § 1983 suit whether under District of Columbia

long-arm statute personal jurisdiction exists over defendants outside the forum in which the

---

[3]      For purposes of this discussion, the Court presumes without deciding that the
federal defendants, each sued in his or her individual capacity, have been served with process.

7

underlying suit was commenced under District of Columbia long-arm statute).  The long-arm

statute allows the Court to exercise personal jurisdiction over a non-resident defendant with

regard to a claim arising from the defendant's conduct in:

> (1)    transacting business in the District of Columbia;
> (2)    contracting to supply services in the District of Columbia;
> (3)    causing tortious injury in the District of Columbia by an
>        act or omission in the District of Columbia; [or]
> (4)    causing tortious injury in the District of Columbia by an act
>        or omission outside the District of Columbia if he regularly
>        does or solicits business, engages in any other persistent
>        course of conduct, or derives substantial revenue from goods
>        used or consumed, or services rendered, in the District of
>        Columbia[.]

D.C. Code § 13-423(a).[4]

Second, the Court must determine whether the exercise of personal jurisdiction satisfies

due process requirements.  *See, e.g., Morris v. U.S. Prob. Serv.*, No. 09-0799, 2010 WL

2802661, at *2 (D.D.C. July 16, 2010) (citations omitted).  This portion of the analysis turns on

whether a defendant's "minimum contacts" with the District of Columbia establish that "the

maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

These minimum contacts must arise from "some act by which the defendant purposefully avails

[himself] of the privilege of conducting activities with the forum state, thus invoking the benefits

and protections of its laws."  *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cty.*, 480

U.S. 102, 109 (1988) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

The federal defendants argue that, with the exception of Harrell Watts, the Court lacks

---

[4]    The alternative bases set forth under the long-arm statute are inapplicable.

personal jurisdiction over them. *See* Defs.' Mem. at 10-14. According to the complaint, defendant Nalley, the BOP's North Central Regional Director, maintains an office in Kansas City, Kansas, as do FBI Special Agent Keszei, Assistant United States Attorney Martin, and Deputy United States Marshals Shute, Johnson, and Franklin. Defendants Wiley, Synsvoll, Crist, Bond, Martinez, and Heim are BOP staff members at ADX, and the unidentified mailroom officers work at FTC Oklahoma City and ADX. Nothing in the complaint suggests that these defendants either reside or maintain a principal place of business in the District of Columbia.

Plaintiff argues that these individuals' actions occurred in conjunction with BOP, FBI and USMS personnel working from offices in the District of Columbia, and that they "routinely and persistently violated the plaintiff's civil rights for the purposes of the D.C. Code 'long arm statute.'" Pl.'s Opp'n at 4-5. These assertions alone are not sufficient.

Plaintiff does not allege specific facts showing that these defendants transact any business or contract to supply services in the District of Columbia. Although persistent conduct undertaken in a person's individual capacity may constitute transacting business for purposes of the long-arm statute, *see Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990), the complaint sets forth no allegations that these defendants have any personal connection with the District of Columbia other than their federal employment. The mere fact that they are federal government employees, affiliated with agencies headquartered or maintaining offices in this district, does not render them subject to suit in their individual capacities in the District of Columbia. *Id*. at 666 (concluding that the Court had no basis for asserting personal jurisdiction over the warden of a BOP facility in Springfield, Missouri because he "surely does not transact any business in the District of Columbia"); *see Ali v. District of Columbia*, 278 F.3d 1, 7 (D.C. Cir. 2002)

(dismissing claims of District of Columbia offender housed under contract in a Virginia facility against Virginia officials in their individual capacities over whom this district court lacked personal jurisdiction); *cf. FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 39 (D.D.C. 2007) (concluding that "defendant's 'regular' phone calls into the District of Columbia from elsewhere do not constitute 'transacting business' in the District of Columbia"), *aff'd*, 529 F.3d 1087 (D.C. Cir. 2008).

Plaintiff is no more successful in establishing that these defendants caused any tortious injury in the District of Columbia. The actual injuries of which plaintiff complains occurred in Oklahoma City, Oklahoma, Kansas City, Kansas, and Florence, Colorado. Regardless of whether these defendants acted in or outside of the District of Columbia, plaintiff suffered no injury here. The amended complaint is devoid of factual allegations supporting the exercise of personal jurisdiction over these defendants based on their purposeful or repeated contacts with this forum, and there is no showing that these defendants could reasonably anticipate being haled into court here. For these reasons, the Court concludes that it lacks personal jurisdiction over defendants Nalley, Keszei, Martin, Shute, Johnson, Franklin, Wiley, Synsvoll, Crist, Bond, Martinez, Heim and the unidentified mailroom officers work at FTC Oklahoma City and ADX.

*B. Venue*

"Courts in this jurisdiction must examine challenges to . . . venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). In a civil action where the Court's jurisdiction is not based solely on diversity of citizenship, such as this case, venue is proper in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2)

a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b). Venue is not proper in this district under any of the provisions of 28 U.S.C. § 1391(b): defendants do not all reside in the District of Columbia, no substantial part of the events giving rise to plaintiff's claim took place here, and this is not a case in which no other district is available.

In a case filed in a jurisdiction in which venue is improper, the Court, must either dismiss the case or, in the interest of justice, transfer the action to any other district where it could have been brought. 28 U.S.C. § 1406(a). The decision to transfer an action on this ground is left to the discretion of the Court. *See Novak-Canzeri v. Saud*, 864 F. Supp. 203, 207 (D.D.C. 1993). As the Court will address below, plaintiff's claims against the federal defendants are not meritorious, and it is not in the interest of justice to transfer this action elsewhere.

## *C. Liability Under a Respondeat Superior Theory*

Defendants Watts and Nalley argue that the only theory under which they can be sued is a *respondeat superior* theory, by which they as supervisors would be deemed liable in their individual capacities for the unlawful actions of their subordinates. Defs.' Mem. at 16. No such theory applies with respect to a constitutional claim against a federal employee in his individual capacity under *Bivens*, which provides a plaintiff "an implied private action for damages against federal officers alleged to have violated [his] constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Critical to a *Bivens* claim is an allegation "that the defendant federal official was personally involved in the illegal conduct." *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997).

According to plaintiff, Watts and Nally acknowledged and approved the alleged unlawful actions of BOP staff at FTC Oklahoma City and ADX. Plaintiff neither pleads nor otherwise establishes that Watts or Nally personally took part in confiscating plaintiff's mail or otherwise causing him injury. Their supervisory roles do not render them personally liable for the alleged wrongful acts of the other BOP employees. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that *respondeat superior* liability cannot form the basis of liability for a § 1983 claim); *Cameron*, 983 F.2d at 258 (concluding that a complaint naming the Attorney General and the BOP Director as defendants based on theory of *respondeat superior*, without allegations specifying their involvement in the case, does not state a claim against them under *Bivens*); *Epps v. United States Attorney General*, 575 F. Supp. 2d 232, 239 (D.D.C. 2008) (citing *Marshall v. Reno*, 915 F. Supp. 426, 429-30 (D.D.C. 1996)) ("A superior official cannot be held liable under Section 1983 or *Bivens* for the constitutional torts of employees under him or her; the common law theory of respondeat superior does not pertain to the federal government in this context.").

### E. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). This protection is afforded to government

officials whether their "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations and internal quotation marks omitted). "[A]ll but the plainly incompetent or those who knowingly violate the law" may enjoy the protection of qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability, . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Accordingly, courts must "resolv[e] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-step analysis for resolving government officials' qualified immunity claims. First, the Court decides "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id*. at 201. If the plaintiff accomplishes this first task, the Court then decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id*. The sequence of this analysis no longer is mandatory, and now the courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

The Court now addresses plaintiff's contentions and concludes that he fails to allege the violation of a constitutional right with respect to his security classification, designation to ADX, and the alleged interference with incoming and outgoing mail.

1. Security Classification and Designation to ADX

The federal defendants argue that plaintiff's claims arising from his transfer and designation to ADX and the assignment of a management variable lack merit because a federal prisoner has no protected liberty interest in these matters. Defs.' Mem. at 19-21. Plaintiff maintains that prison officials "must put the prisoner on notice of what historical events will be used to demonstrate his fulfillment of the predicate concerns for his classification and placement in a 'supermax' facility and the corresponding restrictions on his liberty prior to innacting [sic] restrictive conditions of confinement that qualify as 'special administrative measures'" under applicable BOP regulations. Pl.'s Opp'n at 17. He alleges that "he was classified as a terrorist and assigned to the ADX 'supermax' facility without due process," *id.* at 18, based in part on "erroneous information that was constructively amended by the U.S. Probation Officer to reflect finding(s) of criminal conduct that was neither found guilty or [sic] plead guilty to in any court of law or B.O.P. administrative proceedings," *id.* at 19.

Plaintiff's assertions do not overcome case law holding that a prisoner has no constitutionally protected interest in his place of confinement or security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983) (holding that a prisoner has no constitutionally protected interest in the place of his confinement); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (finding that prisoner's liberty interest is not implicated by his transfer from a medium to a maximum security institution); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (noting that prison officials' exercise of discretion to assign a security classification to an inmate does not implicate an inmate's liberty interest); *Cardoso v. Calbone*, 490 F.3d 1194, 1198 (10th Cir. 2007) (affirming district court's ruling that a "reduction in [plaintiff's] classification level does not implicate a liberty interest"); *Gross v. Holder*, No. 10-0194, 2010 WL 2179173, at *2 (D.D.C.

14

June 1, 2010) (noting that an inmate has no due process liberty interest in obtaining or maintaining a particular security classification or in his designation to a particular correctional facility); *James v. Reno*, 39 F. Supp. 2d 37, 40 (D.D.C. 1999) (holding that a prisoner has no liberty interest in his security classification or place of confinement); *see Perez v. Fed. Bureau of Prisons*, 229 Fed. Appx. 55, 58 (3d Cir. 2007) (finding that BOP did not violate inmate's Fourteenth Amendment due process rights by assigning a public safety factor resulting in restrictions on his telephone privileges).

### 2.  Mail Restrictions

Insofar as plaintiff alleges violations of rights protected by the First, Fourth, Fifth and Sixth Amendments to the United States Constitution, his claims fail.[5]

### First Amendment

"There is no iron curtain drawn between the Constitution and the prisoners of this country," *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974), and "[i]nmates clearly retain protections afforded by the First Amendment." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  Plaintiff's First Amendment challenges pertain both to his right to freedom of speech and his right to access to the courts.

A prison regulation infringing on an inmate's right to free speech is valid if it is reasonably related to a legitimate penological interest, *see Turner v. Safley*, 482 U.S. 78, 89 (1987); *Spitsyn v. Morgan*, 160 Fed. Appx. 593, 594-95 (9th Cir. 2005) (vacating district court's judgment on the pleadings where a state prisoner alleged that prison officials violated his

---

[5]      The Fourteenth Amendment does not apply to federal government, *see Bolling v. Sharpe*, 397 U.S. 497, 499 (1954), and therefore plaintiff's complaint fails to state a claim under the Fourteenth Amendment with respect to the mail restrictions.

constitutional rights by withholding his mail "because restrictions on prisoners' mail may implicate the First Amendment in the absence of a reasonable relationship to legitimate penological interests"). Deference should be given to prison administrators' decisions, especially when those decisions deal with issues of prison safety and security. *See Turner*, 482 U.S. at 89; *see also Cotner v. Knight*, 61 F.3d 915 (10th Cir. 1995) (table) ("[T]he rights of prisoners to correspond with people outside of the prison must be weighed against the intractable problems of prison safety and security, areas in which prison officials are far better equipped to deal with than the judiciary.").

BOP regulations authorize a warden to place an inmate on restricted general correspondence status "based on misconduct or as a matter of classification." 28 C.F.R. § 540.15(a). Among the determining factors is an inmate's "[h]aving committed an offense involving the mail." 28 C.F.R. § 540.15(a)(5). If the general correspondence restriction is not based on an incident report, the Warden must advise the inmate in writing of the reasons for the restriction, give the inmate an opportunity to respond, and notify the inmate of his decision and the reasons therefore. 28 C.F.R. § 540.15(c)(2). If a general correspondence restriction is imposed, the inmate may correspond with his spouse (including a common-law spouse if such a relationship previously had been established in a state which recognizes such common-law relationships), mother, father, children and siblings, unless these family members were involved in a violation of correspondence regulations or would be a threat to the security and good order of the institution.[6] *See* BOP Program Statement 5265.11, <u>Correspondence</u> (7/9/99) at 14.

---

[6]     Plaintiff contends that the BOP has not allowed him to correspond with Grayzna Schulz, the woman he married in September 2003 while incarcerated. Pl.'s Opp'n at 21-23. It

(continued...)

Plaintiff had initiated fraudulent schemes from prison on more than one occasion, and he had used the mail in furtherance of these efforts. Although Warden Riley's decision to restrict plaintiff's correspondence to immediate family members implicated plaintiff's First Amendment rights, the decision furthered a legitimate penological interest by limiting his ability to manipulate or swindle others. For these same reasons, the federal defendants exercise of discretion to follow the sentencing judge's recommendations prior to imposition of the general correspondence restriction, these acts, too, furthered a legitimate penological interest. *Hill v. United States*, No. 1:08cv1, 2010 WL 3210971, at *5 (N.D. W. Va. July 1, 2010) (Magistrate Judge's Amended Report and Recommendation that individual corrections officers did not unconstitutionally interfere with an inmate's right to communicate with his doctor by directing the doctor to send her letters to the plaintiff through the prison medical center for security reasons); *see Thornburgh v. Abbott* , 490 U.S. 401, 415-19 (1989) (finding that policy allowing prison officials to reject incoming mail deemed detrimental to security does not violate First Amendment); *Koop v. Rolfs*, 129 F.3d 126 (9th Cir. 1997) (table) (dismissing state prisoner's claim that prison officials violated his First Amendment rights by reading incoming personal mail); *Olmstead v. Horner*, No. 08-cv-438, 2008 WL 4104007, at *5 (W.D. Wis. Sept. 3, 2008) (upholding restriction on inmate's sending or receiving mail to or from his criminal co-defendant as reasonably related to valid correctional goals, and to his ex-wife at her request); *cf. Samford v. Dretke*, 562 F.3d 674, 680 (5th Cir. 2009) (per curiam) (upholding enforcement of "negative

---

[6](...continued)
appears that Warden Wiley denied plaintiff's request to correspond with her because plaintiff "attempted to utilize Grayzna Schulz to defraud others as well as her." *Id.*, Ex. 18 (Response to Inmate Request to Staff Member dated June 12, 2008).

mail list" and removal of plaintiff's sons from approved visitors list).

An inmate has a First Amendment right of access to the courts that is adequate, effective, and meaningful. *See Bounds v. Smith*, 430 U.S. 817, 821-22 (1977); *Ex parte Hull*, 312 U.S. 546, 549 (1941). It is not enough for an inmate to state in a conclusory fashion that he was denied access to the courts; rather, he also must allege actual injuries as a result of the denial by claiming that an actionable claim was rejected, lost, or prevented from being filed. *See Lewis v. Casey*, 518 U.S. 343, 356 (1996) (stating that an inmate alleging violation of *Bounds* must show actual injury, without which he has no standing to raise the claim). Here, plaintiff does not allege that he suffered actual prejudice or injury either as a result of the general correspondence restriction or stemming from the BOP's prior alleged interference with incoming and outgoing mail.

## Fourth Amendment

Plaintiff alleges a violation of his Fourth Amendment right to be free from unlawful search or seizure of his mail. However, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527-28 (1994). And in plaintiff's case, "restrictions based upon plaintiff's correspondence following his repeated efforts to initiate new fraudulent schemes while incarcerated did not violate the Fourth Amendment because plaintiff had no reasonable expectation of privacy in his non-legal mail." *Akers v. Shute*, No. 08-3106-SAC, 2010 WL 934616, at *2 (D. Kan. Mar. 11, 2010).

## Fifth Amendment

18

Plaintiff received written notice of the general correspondence restriction, and this notice informed plaintiff of his right to "respond to [his] being placed on restricted general correspondence (orally or written)," of the Warden's duty to respond in writing, and the plaintiff's right to "seek formal review . . . through the Bureau's Administrative Remedy Program." Defs.' Mem., Ex. C. Plaintiff was afforded notice of his restricted general correspondence status, an opportunity to respond, and the right to pursue an inmate grievance if he disagreed with the Warden's final decision. It cannot be said that plaintiff was denied notice and an opportunity to be heard before the Warden imposed the mail restriction pursuant to 28 C.F.R. § 540.15.

Sixth Amendment

Although correspondence with counsel in a criminal matter implicates the Sixth Amendment right to counsel, the right is not without limits. *See, e.g., Wolf v. McDonnell*, 418 U.S. 539, 556 (1974) ("[T]he fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."); *see also McMaster v. Pung*, 984 F.2d 948, 952 (8th Cir. 1993) (finding that, because inmate "was being disciplined for his intimate contact with his female attorney," neither a ban on contact visits with the attorney nor inspection of legal mail from the attorney violated his right to counsel). Here, plaintiff does not allege that the restriction prejudiced or injured him with respect to criminal proceedings.

Plaintiff cannot establish that the federal defendants violated a right protected by the First, Fourth, Fifth or Sixth Amendment to United States Constitution, and, therefore, these defendants are entitled to qualified immunity. *See Wickner v. McComb*, No. 09-1220, 2010 WL

3385079, at *11 (D. Minn. July 27, 2010) (prison staff who seized from plaintiff's cell certain mail, which he used to hide or smuggle contraband, did not violate plaintiff's First Amendment right and therefore were entitled to qualified immunity); *Ray v. Metts*, No. 4:04-23048, 2009 WL 2983008, at *11 (D.S.C. Sept. 14, 2009) (prison officials who enforced policy "adopted to prevent contraband, such as weapons and drugs, from being brought into the [facility] through the mail" are entitled to qualified immunity).

### F. Plaintiff's In Forma Pauperis Status

A prisoner may not proceed *in forma pauperis* if, while incarcerated, he has filed at least three prior cases that were dismissed as frivolous, malicious, or for failure to state a claim. 28 U.S.C. § 1915(g). In December 2008, this Court determined that plaintiff had not yet accumulated "three strikes" for purposes of 28 U.S.C. § 1915(g). *Akers v. Watts*, 589 F. Supp. 2d 12, 15-16 (D.D.C. 2008). Defendants indicate that plaintiff since has accumulated an additional "strike" such that plaintiff should "be denied *in forma pauperis* status in this jurisdiction going forward." Mem. of P. & A. in Support of Defs.' Mot. to Dismiss at 1 n.1. The Court concurs.

Because plaintiff has accumulated more than "three strikes," *see Akers v. Watts*, 589 F. Supp. 2d at 14 (identifying two strikes); *Akers v. Poisson*, No. 9-54-P-S, 2009 WL 1375167, at *1 (D. Me. May 15, 2009) (affirming the Magistrate Judge's Recommended Decision and dismissing complaint with prejudice for failure to state a claim for which relief can be granted); *Akers v. Keszei*, No. 08-cv-334-JL, 2009 WL 1026449, at *1 (D.N.H. Apr. 15, 2009) (approving the Magistrate Judge's Report and Recommendation to "dismiss[] the action in its entirety as it has failed to state any claim upon which relief might be granted"); *Akers v. Crow*, No. 09-3037-

RDR, 2009 WL 512335, at *3 (D. Kan. Mar. 2, 2009) (dismissing the complaint "as frivolous and as stating no claim for relief"), he is not eligible to proceed *in forma pauperis* in the future, absent a showing that he "is under imminent danger of serious physical injury" at the time he files a new civil action. 28 U.S.C. § 1915(g).

### III. CONCLUSION

Plaintiff cannot state cognizable claims with respect to the assignment of a management variable, his transfer or designation to ADX, his restricted general correspondence status, or any other alleged interference with incoming or outgoing mail. It matters not whether he adequately states a conspiracy claim, whether his claims are barred as untimely or under *Heck v. Humphrey*, 512 U.S. 477 (1994), whether he exhausted his available administrative remedies prior to the filing of this action, or whether the relief he demands is permissible under the prevailing law.[7] The Court will grant the federal defendants' motion to dismiss. An Order accompanies this Memorandum Opinion.


Signed:          EMMET G. SULLIVAN
                 United States District Court

Dated:           September 24, 2010

---

[7]        The federal defendants argue that the doctrine of sovereign immunity bars plaintiff's claims against them in their official capacities and against federal government agencies themselves. *See* Defs.' Mem. at 8-9. Plaintiff does not bring this action against the individual defendants in their official capacities, *see* Pl.'s Opp'n at 3, and the argument does not apply to this case.